PHILIPPE R. GENDRON *vs.* GEORGE A. STOCKLEY, JR.
LOLA H. GENDRON *vs.* SAME.

DECEMBER 6, 1943.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. These are actions on the case brought respectively by a man and his wife to recover damages resulting from a collision, which occurred at night on Smithfield avenue in the city of Pawtucket, between an automobile driven by him northerly and one driven by the defendant southerly and which is alleged to have been due to negligent driving by the defendant. There was no curve in the road in the vicinity of the collision.

In the original declaration by the husband the only damages claimed were for bodily injuries sustained by him; and in the declaration by the wife the only damages claimed were to the car, which was alleged to have been owned by her. A jury trial of the two cases together in the superior court resulted in an involuntary nonsuit in the wife's case, at the close of the testimony in chief for the plaintiffs, and in a verdict for the defendant in the husband's case, at the close of the trial. Thereafter a motion by the plaintiff in

that case for a new trial was denied; and the two cases are now before us on bills of exceptions by the respective plaintiffs.

Before us the only exception relied on in the wife's case is to the entry of the nonsuit; and in the husband's case the principal exception relied on is to the denial of his request that certain instructions be given to the jury, the only other exception relied on being to the denial of his motion for a new trial, based on the ground that the verdict was against the evidence and the weight thereof.

The wife did not testify at all and the only evidence as to the ownership of the car was testimony by the husband. He testified that he paid for the car, but from "just a habit" registered it under her name. He also said that he considered it "hers and mine". He next testified that his money was her money. Then he testified that he bought the car with his money, took the bill of sale of it in his own name and paid for it. Then, when asked by the defendant's attorney this question: "It was your car? Right?", he first replied: "I always called it my car." But when the defendant's attorney and the trial justice insisted that he answer the question, he said: "That is right." No evidence contrary to this was introduced, though there was plenty of opportunity to introduce it.

After the defendant's motion for a nonsuit in the wife's case was sustained, the attorney for the husband, who was also the wife's attorney, moved in behalf of the husband that he be permitted to amend his declaration and bill of particulars so as to include among the damages alleged therein the damages to the car. This motion was granted and the declaration and bill of particulars were amended accordingly.

In view of all these facts relative to the ownership of the car, we are of the opinion that there is no merit in the only exception relied upon by the wife in the hearing before us on her bill of exceptions. In the rest of the discussion in this opinion we shall deal only with the husband's case and shall refer to him exclusively as the plaintiff.

At the time when the collision involved.in that case occurred, the plaintiff was driving his car northerly on Smithfield avenue at about 11 o'clock in the evening on the way to his home in the village of Saylesville. With him in the car was a friend and fellow worker, Messier by name, the two of them having been attending a meeting of a union, to which they belonged. While the plaintiff's car was moving northerly on his right side of the white line which was about in the middle of the traveled part of the road, a collision occurred between his car and the defendant's car, which was then moving southerly at moderate speed, with its left wheels on or a little east of the white line. The plaintiff then lost control of his car and it not only swerved to the left and collided with and badly damaged the left side of another car, which was following and about 50 feet behind the defendant's car, but also continued on ahead and to its left and came to a stop, partly on the sidewalk on its left side of the road and partly on the lawn beyond.

According to a sketch which was made by a state trooper soon after the collision and was introduced in evidence, and the substantial accuracy of which is not in dispute, there was, at the scene of the collisions and for a considerable distance north and south, a sidewalk on each side of the road. Just to the west of the easterly sidewalk there was a hard shoulder 8 feet, 9 inches in width, then two macadam lanes for vehicular travel, each 9 feet wide and separated from the other by a white line, then a hard shoulder strip 6 feet, 8 inches wide, and then, between that and the westerly sidewalk, what is described on the plat as a "construction soft shoulder", 11 feet, 6 inches in width. It was shown by uncontradicted evidence at the trial that this last strip was where there had been car tracks for the operation of trolley cars; that the tracks had been taken up and that it was not suitable for travel by automobiles at the time of the accident, being very soft and rough, and with holes in it.

The state trooper testified, in substance, and his sketch shows, that at the scene of this collision there was a "scrape

mark" about parallel with and 11 inches east of the white line and 8 feet, 8 inches long; and that beginning at a point 6 feet, 2 inches to the south of the south end of that scrape mark and 2 feet, 5 inches to the east of the white line there was another scrape mark, running a little east of south and then swinging to the southwest until it came to the place where the defendant's car stopped and was situated when the sketch was made.

The sketch shows also a "tire skid mark" which was about 3 feet long and 3 feet, 4 inches east of the white line and about parallel with it and the south end of which was about even with the north end of the 3 feet long "scrape mark". Then, beginning at a point about even with the north end of the "tire skid mark" and about 1 foot, 3 inches to the east of it, there was a very long scrape mark, which ran northerly and then northwesterly into the strip where the trolley car tracks had been. The state trooper testified that the plaintiff's car was at the northerly end of this line, continued across that strip and onto the sidewalk.

Across the part of the highway where the trolley car tracks had been and which was marked on the trooper's sketch as "soft shoulder" and on which there was "jagged, broken macadam", he testified that there were, at intervals, wooden horses, "spanning the construction", to keep traffic off from that portion of the road. This and the other testimony of the trooper were not contradicted or impeached in any way.

The plaintiff testified that, when he first saw the defendant's car approaching, it was between 25 and 50 feet away; that he himself was then traveling at a rate of 20 to 25 miles per hour and the defendant at about the same rate; that the defendant's car was then "hugging the white line, coming over the white line"; that he himself "pulled over" to his right so that his right wheels were on the shoulder of the road; and that then the defendant's car swung to its left and, when about 2½ to 3 feet east of the white line, ran into the front left side of the plaintiff's car, damaging the left front fender, the left headlight, bumper guard, hub-

cap and running board of the latter car. He also testified that his doors and left rear fender were damaged. The man who repaired the plaintiff's car testified, that the radiator on it was smashed.

The man who was riding beside the plaintiff at the time of the collision testified that he first saw the defendant's car when it was 40 feet away; that its left wheels were then on the white line, "off and on it" close to it, "hugging the white line"; that the right wheels of the plaintiff's car were on the soft shoulder on his right side of the road; and that each car was going at a speed of 20 or 25 miles an hour. He testified also that this section of Smithfield avenue was dark; that it was a very dark night and that the headlights of both cars were on.

The defendant was driving his car back to Providence after he had spent the evening with a group of friends at the home, in the town of Lincoln, of a sister of one of those friends. The only other person in the car was his fiancée, who sat beside him. According to his testimony his car, just before the collision, was running a little to the right of the white line marking the center of the best part of the road, the macadam between the hard shoulders, or "maybe on it". He kept the car so near or on the white line because he wanted to avoid the very rough part of the road where the trolley car tracks had been taken up, and across which there were the wooden horses.

Then, when he was about on the white line, "maybe 8 inches over" it, the plaintiff's car came at his car "like a flash", and its left front, including the left part of the bumper, the front of the left mudguard and the left front wheel, hit the left side of the plaintiff's car, just behind the center of its front left wheel, and "crashed in the whole side of the car, tore right through the mudguard and took everything right off." He testified also that his car was traveling between 20 and 25 miles per hour; that he did not swerve suddenly to the left before the collision; and

that he would say that the plaintiff's car was traveling at a speed between 50 and 60 miles per hour.

This testimony of the defendant was strongly corroborated by that of a friend who was driving the above-mentioned car which was following about 50 feet back of the defendant's car. In particular this friend testified that after the plaintiff's car hit the defendant's car, the plaintiff's car "just shot along" and its left front end dropped to the ground and skidded along; that it then swerved to its left, hit his own car and badly damaged the left side of it; and that there was no damage to the extreme front end of the defendant's car, but the damage began about the center of the forward left wheel.

The testimony of the defendant and his friend as to the two collisions was strongly corroborated by the undisputed evidence as to the condition of the three cars after the collisions and by the markings on the road as testified to by the state trooper and shown on the sketch made by him. Especially important are the facts that no part of the extreme front left of the defendant's car was damaged and that on the plaintiff's car the radiator, the lights and the left front wheel and fender were all smashed.

After considering all the evidence introduced at the trial and bearing on the questions of negligence by the defendant and contributory negligence by the plaintiff, we are of the opinion that the question whether the plaintiff should recover damages from the defendant was a question for the jury to decide; and that the trial justice was not clearly wrong in denying the plaintiff's motion for a new trial, the material evidence being conflicting and the weight of it not being clearly in favor of the plaintiff. We therefore find that his exception to the refusal of the trial justice to sustain the motion for a new trial should be overruled.

This leaves for determination only the question raised by the plaintiff's exception 4, none of his other exceptions, besides the one already disposed of, being relied upon before us. This exception 4 was taken to the refusal of the

trial justice, in submitting the case to the jury, to give them eight instructions which were requested by the plaintiff. As the plaintiff admits in his brief filed with us, the effect of these instructions "would have been to direct a verdict for the plaintiff, with the Jury determining the amount of the damages only."

We have considered these instructions and are of the opinion that the trial justice did not err in refusing to give them to the jury. We therefore find that there is no merit in this exception.

All of the plaintiff's exceptions are overruled and the case is remitted to the superior court for the entry of judgment on the verdict.

In the case of Lola H. Gendron, the plaintiff's exception is overruled and the case is remitted to the superior court for the entry of judgment on the nonsuit.

*R deB LaBrosse*, for plaintiffs.

*Bernard B. Abedon*, for defendant.